2006-NMSC-002

127 P.3d 548

**Kirk A. JUNEAU, Plaintiff–Appellant,**

v.

**INTEL CORPORATION,
Defendant–Appellee.**

**No. 29,093.**

Supreme Court of New Mexico.

Dec. 23, 2005.

**14**

Hannah Best & Associates, Hannah B. Best, Albuquerque, NM, for Appellant.

Gilkey & Stephenson, P.A., Duane C. Gilkey, Albuquerque, NM, for Appellee.

## OPINION

BOSSON, Chief Justice.

{1} In this retaliation claim under the New Mexico Human Rights Act (NMHRA), NMSA 1978, §§ 28-1-1 to –15 (1969) (as amended through 2004), Plaintiff Kirk Juneau appeals from a summary judgment entered by the district court against him. The court also rejected Plaintiff's request for a jury trial. We conclude that Plaintiff presented sufficient evidence below to create genuine issues of material fact. We also hold that Plaintiff is entitled to a jury trial on his claim of retaliation. Accordingly, we reverse and remand.

## BACKGROUND

{2} Plaintiff was employed at Intel as an equipment engineering technician. In June of 2001 Stephanie Cannaday, a co-worker of Plaintiff, reported to her superior, Judy Russell, that over the last few months she had been bothered by inappropriate conversations of a sexual nature that she had overheard around her work cubicle. Cannaday asked only that the conversations be stopped or that she be moved. After she complained, the conversations ceased.

{3} Intel's Human Resources Department launched a sexual harassment investigation into the allegations. Plaintiff was one of the people implicated by Cannaday. Plaintiff denies participation in the alleged conversations, and claims that he was included in the allegations only because Cannaday suspected him of having an extramarital affair of which she did not approve. Earlier, Cannaday had complained about a screen saver featuring women in bikinis on Plaintiff's work computer.

{4} Despite requests from his superiors during the course of the investigation that he admit to sexual harassment, Plaintiff steadfastly maintained his innocence. Although Plaintiff was present during some of the conversations in question, no one alleged that Plaintiff actually made any inappropriate remarks. According to Plaintiff, the Intel investigators prejudged him as guilty, and incorrectly interpreted his protestations of innocence as evidence of being uncooperative with the investigation and displaying a bad attitude. Additionally, Plaintiff argues that the investigators had contemplated his termination from the beginning, as a means of sending a strong message to other employees regarding the evils of sexual harass-

ment. In essence, Plaintiff claims that Intel was out to make an example of him.

{5} During the course of the investigation, Lin Harris, a Human Resources supervisor who knew Plaintiff from church, initiated a meeting with Plaintiff outside of work. Harris was a superior of the employees who were investigating the claim against Plaintiff. During the meeting, Harris allegedly threatened Plaintiff with repercussions if he continued to contest the allegations against him and pursued litigation. Harris denied these statements and claims the meeting was to discuss the two men's personal relationship. On the day after the meeting with Harris, August 14, 2001, Plaintiff received a permanent written warning regarding sexual harassment and attendance problems. Instead of accepting the warning, Plaintiff followed procedure and requested an open door investigation of the manner in which the Human Resources Department had conducted the sexual harassment investigation.

{6} Two weeks later, on August 30, 2001, despite the alleged threat from Harris, Plaintiff filed the present claim with the Equal Employment Opportunity Commission (EEOC). Shortly thereafter, beginning on September 6, Plaintiff's supervisor, Russell, began documenting claims of substandard performance on Plaintiff's part. On September 13, Russell was mistakenly advised that the EEOC complaint was specifically against her, and she immediately canceled her supervisory meetings with Plaintiff. A day later, on September 14, and acting against the advice of the Human Resources Department, Russell initiated the process for a second written warning regarding Plaintiff's work performance. Russell based the need for the warning on multiple alleged inadequacies including inconsistent performance, missed completion dates and lack of accountability. On December 4, Russell initiated a third warning, which according to Intel's established policy, would result in Plaintiff's termination. On January 23, the third written warning actually issued, and Plaintiff was terminated.

{7} On February 28, 2002, Plaintiff exhausted his administrative remedies with the New Mexico Human Rights Division and filed the present action in state court, claiming that Intel had retaliated unlawfully against him for having filed his complaint with the EEOC, among other reasons. Ultimately, Intel moved for summary judgment on Plaintiff's retaliation claim which the district court granted. Earlier, the district court had rejected Plaintiff's request for a jury trial as being untimely. Plaintiff appeals both rulings directly to this Court pursuant to Section 28-1-13(C) (1987) (amended 2005) (prior to 2005 appeals made directly to Supreme Court).

## DISCUSSION

### Summary Judgment

{8} "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Self v. United Parcel Serv., Inc.*, 1998–NMSC–046, ¶ 6, 126 N.M. 396, 970 P.2d 582; *see also* Rule 1–056(C) NMRA 2004. All reasonable inferences from the record should be made in favor of the nonmoving party. *Celaya v. Hall*, 2004–NMSC–005, ¶ 7, 135 N.M. 115, 85 P.3d 239. Summary judgment is reviewed on appeal de novo. *Id.*

{9} When considering a violation of the NMHRA, we have previously considered helpful federal burden-shifting methodology under Title VII of the Civil Rights Act of 1964. *See Smith v. FDC Corp.*, 109 N.M. 514, 517, 787 P.2d 433, 436 (1990). For a claim of unlawful discrimination, this Court has used the methodology from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Gonzales v. N.M. Dep't of Health*, 2000–NMSC–029, ¶¶ 20–22, 129 N.M. 586, 11 P.3d 550. Under the *McDonnell Douglas* framework, an employee bears the initial burden of demonstrating a prima facie case of discrimination, which then shifts the burden to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action. *Gonzales*, 2000–NMSC–029, ¶ 21, 129 N.M. 586, 11 P.3d 550; *see also McDonnell Douglas* 411 U.S. at 802–05, 93 S.Ct. 1817 (same). The employee then has the opportunity to rebut the employer's proffered reason as pretextual or otherwise inad-

**16**

equate. *Gonzales*, 2000–NMSC–029, ¶ 21, 129 N.M. 586, 11 P.3d 550.

{10} On appeal, Intel defends summary judgment on the basis that Plaintiff failed to establish a prima facie case of discrimination, and even if he did, Intel then demonstrated legitimate, non-discriminatory reasons for all its actions. As we shall see, the core question before us is not whether Intel is ultimately proven correct on the merits, but whether the district court could make that determination on summary judgment without affording Plaintiff the benefit of a trial. The answer to that question depends on whether Plaintiff sufficiently presented evidence to the district court to establish "genuine issues of material fact" for resolution by a jury. *Self*, 1998–NMSC–046, ¶ 6, 126 N.M. 396, 970 P.2d 582; *see also* Rule 1–056.

{11} Plaintiff's claim of discrimination is linked, in turn, to his allegations of unlawful retaliation. The NMHRA, Section 28–1–7(I)(2), declares it an unlawful discriminatory practice for "any person or employer to . . . engage in any form of threats, reprisal or discrimination against any person who has opposed any unlawful discriminatory practice or has filed a complaint . . . under the Human Rights Act." Prohibited acts of "threats, reprisal or discrimination" are considered together under the general label of unlawful retaliation. To establish a prima facie case of retaliation, Plaintiff must show that (1) he engaged in protected activity, (2) he was subject to adverse employment action subsequent to, or contemporaneous with the protected activity, and (3) a causal connection exists between the protected activity and the adverse employment action. *Gonzales*, 2000–NMSC–029, ¶ 22, 129 N.M. 586, 11 P.3d 550.

{12} On appeal, Intel challenges the first and third elements of the prima facie case: both protected activity and causal connection. However, when Intel filed its motion for summary judgment in the district court, it did not adequately raise a challenge to the first element, whether Plaintiff was engaged in protected activity. Intel only made a passing reference in a footnote to concerns about whether protected activity had been shown, specifically arguing that "[i]t is doubtful that Plaintiff engaged in

'protected activity' because his discrimination charge was frivolous." However, Intel did not ask the court to take any action on the issue or award Intel any relief on that basis. To preserve an issue for appeal, a party must clearly raise the issue in the lower court " 'by invoking a ruling from the court on the question.' " *Ciup v. Chevron U.S.A., Inc.*, 1996–NMSC–062, ¶ 22, 122 N.M. 537, 928 P.2d 263 (quoting *State v. Hodge*, 118 N.M. 410, 418, 882 P.2d 1, 9 (1994)). Not having requested or received a ruling on the question of protected activity, Intel failed to preserve any such challenge for consideration by this Court.

{13} We assume, therefore, for purposes of summary judgment that Plaintiff has sufficiently demonstrated two out of the three elements of a prima facie case of retaliation. We assume that Plaintiff has shown protected activity, which includes his claim filed with the EEOC. And it is undisputed that Plaintiff has demonstrated a subsequent adverse employment action, namely Intel's termination of his employment. The remaining question is whether Plaintiff has made a prima facie case of the third element, which requires a causal connection between the two.

{14} According to Plaintiff, any retaliation began at the very inception of the sexual harassment investigation when Intel prejudged the allegations against him, and when Plaintiff refused to confess, Intel began looking for ways to make an example of him. Taken alone, these early events would not give rise to a Human Rights Act claim. The NMHRA protects against discriminatory treatment, not against general claims of employer unfairness. However, these early events can be considered as context for what followed. For example, Lin Harris' alleged threats of retaliation take on a new relevance once Plaintiff filed his formal complaint with the EEOC. After Plaintiff's complaint was filed, his supervisors allegedly made good on those threats by refusing to rate the quality of Plaintiff's work and his completion of tasks in a fair and objective manner. In effect, Plaintiff claims he was set up for termination.

{15} Intel denies any causal connection, denying any retaliation against Plaintiff when he maintained his innocence or when he filed with the EEOC. Intel claims legitimate, non-discriminatory reasons for its actions, including its decision to terminate him. On summary judgment, the non-movant may not rest on the pleadings, but must demonstrate genuine issues of material fact by way of sworn affidavits, depositions, and similar evidence. *Dow v. Chilili Coop. Ass'n,* 105 N.M. 52, 54–55, 728 P.2d 462, 464–65 (1986). Accordingly, we examine whether Plaintiff came forward with sufficient evidence in response to Intel's motion for summary judgment to create genuine issues of material fact that can only be resolved at trial.

## Plaintiff's Case Against Summary Judgment

{16} On summary judgment, Plaintiff did not rest on his pleadings but presented evidence against Intel's motion. Plaintiff produced evidence showing, at least arguably, that some people at Intel contemplated terminating Plaintiff even before the sexual harassment investigation was completed. On August 8, 2001, Peg Feibig, who was investigating the sexual harassment charge, wrote in her notes: "How can we make the envi[ronment] safe for S[tephanie Cannady—the accuser]? Terminate K[irk Juneau]? He is showing no ownership/accountability." Plaintiff offers this statement as evidence that the Human Resources Department was contemplating termination even before its investigation was complete. Plaintiff further bolstered his position that the alleged harassment was only an excuse for his termination when he submitted to the district court Cannaday's testimony that all she wanted was for the conversations to stop or to be moved and that Plaintiff never made any sexual statements directly. Despite Intel's more benign explanation of the Feibig notations, we conclude that at trial a fact-finder could reasonably infer from this evidence that Intel's investigators may have prejudged Plaintiff, concluding that he had to show "accountability" for acts he denied committing.

{17} Plaintiff also demonstrated that Harris, a supervisor in the Human Resources Department and a member of Plaintiff's church, involved himself in the investigation. Harris arranged a meeting with Plaintiff at a local restaurant where, according to Plaintiff, he urged him to admit to being part of the harassment. Plaintiff testified that he was told to seek forgiveness for what he had done and that if he continued to pursue litigation and be defiant, "no rock would be left unturned." Harris acknowledged the meeting, but claimed it was only to see if he and Plaintiff were able to separate their friendship from what was going on at work and that he specifically refused to talk about what was going on at Intel. Again, a reasonable fact-finder could infer from this meeting, including its timing and its context, that Plaintiff was being threatened with retaliation if he continued to contest the allegations against him and filed a claim.

{18} After Plaintiff did file with the EEOC, the alleged retaliation only became more intense and continued over the ensuing months. When Plaintiff's supervisor found out about the EEOC claim, she was ready to issue him another written warning but was told to hold off at that point. Although Plaintiff had received critical work evaluations prior to his supervisor's discovery of the EEOC claim, the timing, frequency, and degree of criticism increased significantly after Plaintiff filed with the EEOC. Plaintiff testified on deposition that a co-worker, Mike Aloi, told him that Russell instructed Plaintiff's immediate supervisor, Jim Graff, to revise Plaintiff's task assignments to show them as incomplete, and thereby set Plaintiff up for termination. If admissible at trial, these statements would be clear evidence of retaliation.

{19} In addition to what Russell may have told third-parties, Plaintiff also testified that Russell complained directly to him, showing her hostility toward Plaintiff and his EEOC claim. In his deposition, Plaintiff testified that Russell stated the EEOC claim was "nonsense," and it was "such a headache," and she wished she did not have to deal with it. Russell showed her hostility by telling Plaintiff that he "created an extra workload for her," and that she had to "babysit" Plaintiff and spend enormous amounts of time

with Plaintiff, as opposed to the rest of the group under her supervision. Plaintiff provided direct evidence of Russell's hostility towards him. On December 5, 2001, when a letter from Plaintiff's attorney was read to Russell, she wrote in her notes the word "disgusting" in response to its contents. Arguably, all of Russell's remarks could be interpreted by the fact-finder as evidence of a retaliatory environment, animated by Russell's desire to get even with Plaintiff for filing the EEOC claim and including her in it.

### Intel's Response: A Temporal Standard

{20} In addition to denying any causal connection between protected activity and Plaintiff's termination, Intel argues based on federal precedent that the time between Plaintiff's EEOC complaint and his termination, nearly five months, precludes a finding of causation. Intel also argues that the seven-week period between the complaint and Plaintiff's second written warning is insufficient by itself to establish causation. The United States Court of Appeals for the Tenth Circuit has held that if the adverse employment action has occurred within a short time after the protected activity, causation may be inferred from this evidence alone. *See Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir.1999) (discussing case law establishing that one and one half months between the protected activity and the adverse employment action may, by itself, establish causation, but three months is too long). Thus, when no other evidence of causation is available, a plaintiff in the Tenth Circuit may rely on an inference of causation arising from a short time period between the protected activity and the adverse employment action. *See, e.g., Meiners v. Univ. of Kansas,* 359 F.3d 1222, 1231 (10th Cir.2004) (holding that three months and one week was too long to establish causation by temporal proximity alone); *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir. 1997) (a three-month period without additional facts would not be sufficient to establish causation); *Ramirez v. Okla. Dep't of Mental Health,* 41 F.3d 584, 596 (10th Cir.1994) (finding that one and one-half month period may be enough to show causation), *overruled on other grounds by Ellis v. Univ. of Kan. Med. Ctr.,* 163 F.3d 1186, 1194 (10th Cir. 1998).

{21} In response, Plaintiff argues that the temporal proximity of each of Intel's adverse actions, as opposed to his ultimate termination, establishes sufficient temporal proximity. *See Marx v. Schnuck Mkts., Inc.,* 76 F.3d 324, 329 (10th Cir.1996) (noting that the "close temporal proximity" standard should not be interpreted too narrowly where retaliatory actions began quickly after the employee filed his Fair Labor Standards claim). From the time Plaintiff filed his claim with the EEOC until the time he was terminated, Plaintiff argues that no more than six weeks passed without some type of adverse employment action. *See id.* at 329 (finding a causal connection when the original write up occurred shortly after filing the claim, but the termination occurred much later). Given the overall context of employer hostility that continued unabated during the entire five-month period, Plaintiff also argues the temporal standard is not relevant because there is other evidence of causation.

{22} We have not been asked in this case to adopt the Tenth Circuit's standards where temporal proximity is the only evidence of causation. In this case, Plaintiff presented other direct evidence of causation, and did not rely on temporal proximity alone. Thus, we decline to apply any temporal proximity analysis in this case or adopt a specific time period for inferring facts related to causation. In this case and unlike certain of the cases cited to us, temporal proximity is only one piece of the evidentiary formulation offered by Plaintiff. *See Meiners,* 359 F.3d at 1231; *Richmond,* 120 F.3d at 209. The fact-finder should be free to consider timing and proximity, along with all the other facts and circumstances, in deciding the ultimate issue of causation. We leave for another day the question of when the time between the employee engaging in protected activity and the employer taking adverse action might be sufficient to allow an inference of a causal connection between the two.

### Justification and Pretext

{23} Since Plaintiff has made a prima facie case for retaliation under the

*McDonnell Douglas* formulation, the burden then shifts to Intel to come forward with a valid justification for the adverse treatment. *See McDonnell Douglas,* 411 U.S. at 802–03, 93 S.Ct. 1817. Once Intel provides a justification, the burden shifts back to Plaintiff to show the justification is merely pretext for a retaliatory motive. *See id.* at 804–05, 93 S.Ct. 1817. At the outset, we note that whether a proffered justification is legitimate, or is merely an excuse to cover up illegal conduct, is largely a credibility issue and often requires the use of circumstantial evidence. It is rare a defendant keeps documents or makes statements that directly indicate a retaliatory motive for terminating an employee. Issues such as this should normally be left exclusively to the province of the jury. Judges should not make credibility determinations or weigh circumstantial evidence at the summary judgment stage.

{24} Intel claims Plaintiff was terminated pursuant to its guidelines that provide for termination of an employee upon the receipt of three written warnings in a rolling twelve-month period. It argues Plaintiff received three written warnings within this period, and two of the warnings were solely related to his work performance, thereby justifying Plaintiff's termination. Intel goes on to argue that Plaintiff has failed to show a genuine issue of material fact that Intel's justification was pretext. We disagree.

{25} Plaintiff is not required to show disputed issues of fact for every element of the claim, *Bartlett v. Mirabal,* 2000–NMCA–036, ¶ 17, 128 N.M. 830, 999 P.2d 1062, and, in any case, Plaintiff has provided evidence from which a jury could conclude Intel's justification was pretext. Indeed, much of the evidence that establishes a genuine issue of fact for causation also demonstrates a factual dispute as to pretext. The record on summary judgment indicates Plaintiff received no discipline for performance issues until after his EEOC complaint was filed. Furthermore, Plaintiff argues the first written warning for sexual harassment was issued because he refused to admit guilt and insisted on pursuing the issue when confronted by Lin Harris. It will be for the factfinder to determine who to believe, Plaintiff or Harris, to determine if the written warning was valid or just retaliation for Plaintiff's actions. In regard to the other two warnings, the record reflects that his coworkers would disagree with the assessments made by his supervisors because they found Plaintiff to be a hard worker. Plaintiff argues this disagreement shows the warnings were merely pretext. Again, the jury must determine whether Plaintiff and his coworkers or Intel and its supervisors are to be believed. Finally, Plaintiff points to Russell's notes regarding the letter from Plaintiff's attorney concerning a potential lawsuit and referring to it as "disgusting." Intel argues, Russell was merely reacting to hyperbole in the letter. It is the province of the jury, not the judge, to interpret Russell's reaction as indicative of a retaliatory motive or not. Plaintiff has satisfied his burden to show there are disputed factual issues regarding Intel's justification.

## Plaintiff Raises Genuine Issues of Material Fact

{26} For the reasons stated, we conclude that Plaintiff put forward sufficient evidence below to create genuine issues of material fact with respect to his retaliation claim against Intel. *Bartlett,* 2000–NMCA–036, ¶ 17, 128 N.M. 830, 999 P.2d 1062 (stating that the nonmoving party does not need to present enough evidence to support all elements of the case, only that one or two factual issues are contested). Construing, as we must, Plaintiff's allegations and proffered evidence in a light most favorable to Plaintiff, we conclude that a reasonable fact-finder could draw certain inferences and come to certain conclusions favorable to Plaintiff's claim. A reasonable fact-finder could conclude that Intel, acting unfairly, was out to make an example of Plaintiff almost from the very beginning, and that this contributed to Intel's negative reaction when Plaintiff filed his complaint with the EEOC. A fact-finder could then conclude that the EEOC complaint caused Intel to intensify its criticism of Plaintiff's work immediately after the claim was filed, setting him up for an eventual termination that had become preordained and inevitable.

{27} Of course, at trial a reasonable fact-finder could side with Intel and conclude just the opposite. We must not lose sight of the fact that Intel proclaims its innocence just as forcefully as Plaintiff did when faced initially with charges of sexual harassment. Trial is the only sure way to test these conflicting allegations, at which time the fact-finder can weigh the evidence and judge the credibility of the principal witnesses. It is well-settled in New Mexico that summary judgment is not an appropriate vehicle for courts to do either. *Bartlett,* 2000–NMCA–036, ¶ 38, 128 N.M. 830, 999 P.2d 1062.

### Jury Trial

{28} Plaintiff filed his Human Rights Act complaint in state court on February 28, 2002, and it was served on Intel on May 1, 2002. Without filing an answer in state court, Intel removed the case to federal court and then filed its answer. Plaintiff's complaint did not request a jury, nor did he file a separate request in federal court.

{29} While the Human Rights Act complaint was pending in federal court, Plaintiff filed a separate federal action under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e–2 (2000), in which Plaintiff did request a jury. The federal magistrate consolidated the two complaints and placed them both on the federal docket for *jury* trials. Thereafter, the Human Rights Act complaint remained pending for jury trial, until November 5, 2002, when the federal court dismissed the EEOC case and remanded the Human Rights Act claim back to state court. Approximately six weeks after the remand, Plaintiff filed his jury demand in state court on December 16, 2002. The district court denied the request stating, "Plaintiff had ample opportunity to request a trial by jury, but failed [to] do so."

{30} The New Mexico Rules of Civil Procedure, Rule 1–038(A) NMRA 2005, requires that a demand for a jury trial be made within ten days after service of the last responsive pleading. Plaintiff failed to file a jury request in either state or federal court within the ten day rule. Notwithstanding that omission, Plaintiff points out that Intel's answer was never filed in state court, and that, while pending in federal court, the case was in fact scheduled for a jury trial, thereby rendering a jury demand superfluous. Upon remand to state court, Plaintiff argues that he filed his jury request within a reasonable period of time, and that Intel suffered no surprise or prejudice by the short six-week delay.

{31} Under Rule 1–039(A) NMRA 2005, if a jury demand is made after the ten-day period, the district court has discretion to determine whether to grant it. We review a district court ruling on the matter for abuse of discretion. *Alford v. Drum,* 68 N.M. 298, 303–04, 361 P.2d 451 (1961).

{32} In the case before us, the district court refused Plaintiff's jury demand because Plaintiff had "ample opportunity" to request a jury earlier and did not do so. Considered in the abstract, the court's consideration of the jury matter does not seem unreasonable. On its face, a delay of nearly nine months between filing the complaint and requesting a jury is excessive, and *without other mitigating circumstances* would certainly justify a judge's rejection of it. On closer scrutiny, however, the court's analysis seems incomplete in light of the rather unique circumstances of this case.

{33} When reviewing a district court's decision to deny a belated demand for a jury, several cases from other jurisdictions have looked at a variety of factors to determine if there was an abuse of discretion. For instance, in *Pinemont Bank v. Belk,* 722 F.2d 232, 238 (5th Cir.1984), the court found it was an abuse of discretion to deny a jury trial when all the parties and the court had in fact assumed the case would be tried to a jury, and no prejudice would result. Other courts look not only to the length of the delay in requesting a jury but also the reasons for the delay, whether the issues are suitable for a jury, whether granting the motion would result in disruption for the court or the opposing party, and whether the opposing party would be prejudiced. *Parrott v. Wilson,* 707 F.2d 1262, 1267 (11th Cir.1983); *see also Daniel Int'l Corp. v. Fischbach & Moore, Inc.,* 916 F.2d 1061, 1064 (5th Cir.1990) (utilizing the same factors).

■ {34} In our view, it is not just a question of whether Plaintiff had an "opportunity" to request a jury trial; it is undisputed that he did. Other factors, including the reason for the delay and whether prejudice will result, must be considered in order to constitute the proper exercise of discretion. *Cf. Carlile v. Cont'l Oil Co.*, 81 N.M. 484, 486, 468 P.2d 885, 887 (Ct.App.1970) (district court may abuse its discretion in failing to grant jury trial where opposing party is not prejudiced, the court is not delayed, and business of the court is not inconvenienced). Looking to these other factors, it is evident the district court should have granted the motion.

■ {35} In reality, during much of the procedural history of this case, Plaintiff had the opportunity to file but no real need. When the case was filed initially in state court, Intel removed the case before filing its answer, and therefore never triggered the ten-day limitation period in state court. During its pendency in federal court, the matter was already set for jury trial. A jury demand would have been perfunctory and unnecessary. It was only upon remand to state court, that Plaintiff had both the opportunity and the need.

{36} A delay of just under six weeks does not seem unreasonable, especially considering that discovery was just unfolding and no trial date had been set. Intel suffered no prejudice and appears to have been aware all along that a jury trial was not only anticipated but in fact scheduled, at least while the case remained in federal court. *Cf. Bates v. Bd. of Regents*, 122 F.R.D. 586, 589 (D.N.M. 1987) (where no prejudice would result to defendant and both parties assumed case was set for jury trial, plaintiff's motion was granted); *Aspen Landscaping, Inc. v. Longford Homes of N.M., Inc.*, 2004–NMCA–063, ¶ 12, 135 N.M. 607, 92 P.3d 53 (distinguishing *Bates* because both parties assumed case was to be tried before a judge, not a jury, until plaintiff belatedly requested a jury).

{37} On balance, given the fundamental importance of a jury trial in our jurisprudence, it appears arbitrary and unfair to Plaintiff for the district court to deny his jury request under these rather special circum-

stances. *See Hernandez v. Power Constr. Co.*, 73 Ill.2d 90, 22 Ill.Dec. 503, 382 N.E.2d 1201, 1204 (1978) (stating the court abused its discretion denying late jury demand, when, under the special circumstances of the case, it failed to "give proper recognition to the need to protect the 'jealously guarded right of trial by jury'" (quoted authority omitted)). Under these circumstances, the court abused its discretion. To rectify that abuse and in the overarching interest of fairness to both sides, we reverse this decision of the district court and remand for a jury trial.

**CONCLUSION**

{38} We reverse the summary judgment. We reverse the district court's ruling to deny Plaintiff's demand for a trial by jury, and we remand for further proceedings.

{39} **IT IS SO ORDERED.**

WE CONCUR: PATRICIO M. SERNA, and EDWARD L. CHÁVEZ, Justices.

PAMELA B. MINZNER and PETRA JIMENEZ MAES, Justices (specially concurring).

MINZNER, Justice (specially concurring).

{40} Although I concur in the result the Majority Opinion reaches, I believe the facts merit a somewhat different analysis. I do agree that there is sufficient evidence of a causal connection between the protected activity of filing a complaint and an adverse employment action to preclude summary judgment. I also agree that the trial court erred in denying Plaintiff's request for a jury trial. I am not persuaded that Plaintiff is entitled to rely on his actions prior to filing a complaint with the Equal Employment Opportunity Commission as evidence of protected activity nor that his employer should be viewed as having waived the right to challenge Plaintiff's reliance on those actions. My reasons for believing that Plaintiff is not entitled to rely on his actions prior to filing the complaint are as follows.

{41} Intel did not wave its protected activity arguments. Intel initially argued in its motion for summary judgment that there was no evidence showing a causal connection between the EEOC claim and Plaintiff's ter-

mination or any other adverse employment action. With this motion, I believe Intel conceded only that filing a complaint with the EEOC was protected activity. In response, Plaintiff argued that Intel retaliated, not only because he filed an EEOC complaint, but also because he denied involvement in harassment. In its reply, Intel clearly stated that the only issue before the court was whether Plaintiff was terminated "as a result of a discrimination charge he filed with the EEOC." Intel specifically argued that "Plaintiff's request for an open door investigation on August 7, 2001 was not 'protected activity.'" Intel also argued that even if Plaintiff had been terminated for refusing to admit he was involved in sexual harassment, this was "not impermissible retaliation in violation of the NMHRA and therefore not subject to the Court's review."

{42} I am not persuaded that Plaintiff's actions prior to filing the complaint with the EEOC were protected activity under the New Mexico Human Rights Act. The NMHRA prohibits discrimination in employment on specific grounds including race, age, religion, sex, physical or mental handicap, sexual orientation or gender identity. NMSA 1978, § 28–1–7(A) (2004). The Act also prohibits discrimination against any person who has "opposed any unlawful discriminatory practice or has filed a complaint, testified or participated in any proceeding under the Human Rights Act." § 28–1–7(I). Thus, the Act prohibits only certain types of discrimination; it does not prohibit all unfair or unreasonable employment actions. Cf. Feliciano de la Cruz v. El Conquistador Resort and Country Club, 218 F.3d 1, 8 (1st Cir. 2000) (holding that proof that termination was "unfair" is not sufficient to state a claim under Title VII; courts do not assess the merits or even rationality of employers' non-discriminatory business decisions); Morrow v. Wal–Mart Stores, Inc., 152 F.3d 559, 564 (7th Cir.1998) ("Title VII prohibits discriminatory employment actions, not hasty or ill-considered ones.").

{43} There is no indication in the record that Plaintiff was protesting discriminatory treatment. He simply asserted that he had not had any inappropriate conversations, and

any discipline would therefore be unfair. Similarly, Plaintiff's internal complaint regarding the sexual harassment investigation alleges that the investigators "prejudged" his case, and reached their conclusions without adequate evidence. Plaintiff did not assert that the investigators were biased because of his membership in a protected class. He simply claims that the investigation was unfair. The NMHRA ought not be construed to protect such a general claim.

{44} By including such a general claim within the scope of protected activity, we seem to me to create a troublesome and unnecessary difficulty for employers dealing with sexual harassment complaints. If an employer fails to take corrective action, that employer may be held responsible for a hostile work environment. If an employee suspected of involvement in sexual harassment is unhappy with the corrective action taken, that employee may perceive the employer to be retaliating for what the employee considers just criticism. I believe we ought not construe the NMHRA to protect resistance to a non-discriminatory investigation of a sexual harassment claim.

{45} However, even if Plaintiff's only protected activity was filing a complaint with the EEOC, Plaintiff appears to have met his prima facie burden by presenting some evidence suggesting that his EEOC complaint caused Intel's adverse employment action. Plaintiff offered evidence that he started receiving poor reviews and feedback after filing his complaint. He also provided direct evidence that his supervisors were aware of his complaint and were upset that it had been filed. A plaintiff can provide direct evidence of discrimination if he or she can demonstrate that there is a nexus between discriminatory comments, and the disputed employment decision. Stover v. Martinez, 382 F.3d 1064, 1077–78 (10th Cir.2004). The record shows that the same supervisor commented on the complaint, complained about having to "babysit" Plaintiff, and made the ultimate decision that resulted in Plaintiff's termination. She initiated disciplinary action shortly after the complaint was filed. Plaintiff has shown a nexus between the retaliato-

ry comments and the adverse employment action.

{46} Intel has offered a legitimate, non-discriminatory reason for Plaintiff's termination, showing that Plaintiff had a record of poor cooperation and communication skills, and had failed to complete many of the tasks he was assigned in a timely manner. The showing was not sufficient to support summary judgment as a matter of law because Plaintiff has presented sufficient evidence to allow a reasonable factfinder to conclude that concerns about Plaintiff's performance were a pretext for retaliation. While far from overwhelming, the evidence supporting Plaintiff's prima facie case would also allow a jury to conclude that Intel did not actually believe that Plaintiff's performance had deteriorated. For example, the evidence that Plaintiff's supervisor was aware of the complaint, considered it "disgusting," changed Plaintiff's review process, and initiated disciplinary proceedings shortly after learning of the complaint, could support the jury's conclusion that the complaint was the true motivation for disciplinary action. *See Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1323–24 (8th Cir.1994). Because I conclude that Plaintiff has made a sufficient showing to survive summary judgment, I concur in the result reached by the majority.

I CONCUR: PETRA JIMENEZ MAES, Justice.